## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED AIRLINES HOLDINGS, INC. | | ) |
| | | ) |
| | | ) |
| Plaintiff, | | ) |
| v. | | ) |
| | | ) |
| HOMESITE INSURANCE COMPANY | | ) |
| | | ) |
| Defendant. | | ) |

## UNITED AIRLINES HOLDINGS, INC. COMPLAINT

Plaintiff United Airlines Holdings, Inc. ("United") by its attorneys, files this Complaint against Defendant Homesite Insurance Company ("Homesite")[1] and states as follows:

## NATURE OF THE ACTION

1.      This case is about an insurer that took United's premium, watched every other insurer in a multi-layered cyber insurance tower pay a valid claim in full, and then—standing alone against the unanimous judgment of seven other insurers—refused to honor its own policy.

2.      Homesite collected premiums to insure United against catastrophic cyber events. Yet, when the largest IT outage in modern history struck on July 19, 2024, crippling United's operations, stranding over 200,000 passengers, and inflicting tens of millions in loss to United, Homesite refused to honor its $5,000,000 policy. It did so despite the fact that every other insurer in United's cyber tower—including the insurer sharing Homesite's exact layer of liability, subject to the identical policy terms, and represented by the same counsel—concluded that coverage applied and paid in full. Homesite's refusal is not a good-faith coverage dispute. It is an outlier position, unsupported by the plain language of the policy Homesite itself issued, contradicted by

---

[1] Homesite's policy at issue in this case is administered by its Program Administrator, Bowhead Specialty.

the conduct of every other insurer that evaluated the same claim, and driven by a transparent desire to avoid its contractual obligations at United's expense.

3. On July 19, 2024, a defective software update by CrowdStrike, Inc. ("CrowdStrike") to millions of endpoints simultaneously caused one of the largest and most consequential IT outages in modern history—a global systems failure that did not merely degrade performance but rendered entire computing environments nonfunctional, crippling millions of Windows-based systems across the globe and bringing operations to a standstill worldwide (the "CrowdStrike Outage"). The CrowdStrike Outage struck United during one of the busiest travel weekends of the summer. United was forced to cancel more than 1,600 flights—approximately 12 percent of its entire schedule—and delay thousands more, stranding over 200,000 passengers at airports across the country.

4. In the wake of this unprecedented crisis, the U.S. Department of Transportation ("DOT") directed United to compensate its stranded passengers, making clear that any failure to do so would constitute a violation of federal law carrying civil penalties of $75,000 per violation— penalties that, across 1,600 cancelled flights and hundreds of thousands of affected passengers, threatened liability in the hundreds of millions, if not billions, of dollars. United complied with federal law, as any responsible carrier would, incurring $20,423,430 in Passenger Compensation (the "Customer Costs"). In total, United incurred $113,670,277 in covered Loss from the CrowdStrike Outage.

5. United maintained a comprehensive, multi-layered cyber insurance program providing up to $200,000,000 in coverage above a $50,000,000 self-insured retention ("SIR"). As part of that program, Homesite issued an Excess Follow Form Cyber Liability Insurance Policy, Policy No. YXS-158749112-01, to United for the period from June 1, 2024 to June 1, 2025 (the

2

"Homesite Policy"), providing a $5,000,000 limit of liability in excess of $95,000,000 in underlying coverage and SIR. A true and correct copy of the Homesite Policy is attached as **Exhibit 1**.

6.      United timely submitted its claim. Seven insurers spanning six layers of coverage—from AIG at the primary level through the fourth excess layer—reviewed United's Loss, applied the same policy language, and unanimously agreed that coverage applied. Every one of them paid its full policy limits. Indian Harbor Insurance Company ("Indian Harbor") shares Homesite's layer of liability at the same $95,000,000 attachment point on a 50/50 basis (i.e., for any amount owed by the $10,000,000 layer, they each pay 50% until the layer is exhausted) And while Indian Harbor and Homesite are subject to the same policy terms, Indian Harbor honored its obligation to pay 50% of each dollar owed up to its $5,000,000 limit, but Homesite refused to pay its 50% share.

7.      Homesite's stated reasons for denying coverage are pretextual and meritless. Homesite claims that United's federally compelled payments to stranded passengers were merely "voluntary", "discretionary", and "gestures of goodwill" rather than the legally mandated compliance they plainly were. Homesite invokes policy exclusions that are expressly overridden by endorsements for which United paid a premium. Homesite asserts that United should have halted compliance with a binding DOT directive during an unprecedented operational crisis to first obtain Homesite's written permission. And Homesite contends that express policy language providing for erosion of the SIR by additional-insured payments does not mean what it plainly says. Not a single other insurer in the tower refused to pay based on any of these positions. And each position is contradicted by the plain language of the Policy Homesite issued.

8.      Standing alone against the unanimous judgment of every other insurer in the tower, Homesite refuses to honor its obligations, raising one meritless coverage objection after another—

and each designed not to reach a good-faith coverage determination but rather to avoid paying a valid claim. Homesite's vexatious and unreasonable conduct has forced United to incur substantial attorneys' fees and costs in pursuit of coverage that is plainly owed.

9. Homesite's breach has caused United substantial damages, including the full $5,000,000 in policy limits that remain unpaid, together with attorneys' fees and costs incurred in responding to Homesite's pretextual denials, participating in a required and unproductive mediation, and in prosecuting this action.

10. United brings this action for breach of contract and bad faith and seeks: (1) the full $5,000,000 in policy limits that Homesite has refused to pay; (2) damages for Homesite's vexatious, unreasonable, and bad-faith refusal to honor clear and unambiguous policy obligations that every other insurer in the tower recognized and honored; and (3) attorneys' fees, costs, and all other relief available under 215 ILCS § 5/155 and applicable law, including, but not limited to allotted penalties under the same.

## THE PARTIES

11. Plaintiff United Airlines Holdings, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

12. Defendant Homesite Insurance Company is an insurance company domiciled in Massachusetts with its principal place of business in Boston, Massachusetts. Homesite issued the Policy to United through its program administrator, Bowhead Specialty.

## JURISDICTION AND VENUE

13. The amount in controversy exceeds $75,000, exclusive of interest and costs.

14. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states. United is a citizen of

4

Delaware and Illinois, and Homesite is a citizen of Massachusetts, and the amount in controversy exceeds the jurisdictional minimum.

15. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District. The Policy was issued and delivered to United in Chicago, Illinois. United's principal place of business is located in this District; and the CrowdStrike Outage had to be addressed with direction from United's headquarters in this District. Illinois law governs the interpretation of the Policy.

<b><u>FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS</u></b>

**I.      CrowdStrike Outage**

16. On July 19, 2024, one of the largest and most consequential IT outages in modern history struck without warning, crippling millions of Windows-based systems across the globe and inflicting massive financial harm on businesses, governments, and individuals in virtually every sector.

17. This unprecedented disruption was caused by CrowdStrike, a security vendor. CrowdStrike's Falcon platform, an endpoint detection and response tool used by organizations of all sizes and across all industries, is integrated into the Microsoft Windows operating system. A critical flaw in version 7.11 of the Falcon platform's sensor caused the sensor to crash, which in turn triggered a cascading failure of the Microsoft Windows OS itself. The result was the now-infamous CrowdStrike Outage.  This was a system-level failure that rendered computers entirely inoperable and brought operations to a standstill across the world.

18. The scale of the disruption was staggering. Because the Falcon platform is embedded in the Windows operating system, the defective sensor update did not merely degrade performance — it rendered entire computing environments nonfunctional. Organizations,

5

including airlines, that relied on Windows-based systems for mission-critical operations were left scrambling to restore functionality.

19. United was among the organizations severely impacted by the CrowdStrike Outage. United operated the Microsoft Windows OS across its IT infrastructure, and when the defective CrowdStrike sensor update deployed on July 19, 2024, it caused a massive and immediate outage of United's IT systems, paralyzing significant parts of the airline's operations and stranding more than 200,000 of its customers.

20. The outage struck during one of the busiest travel weekends of the summer, compounding the disruption and magnifying the harm to United's customers and operations. United was forced to cancel more than 1,600 flights — approximately 12 percent of its entire schedule — and delay thousands more. On July 19th alone, United was forced to cancel 909 flights – 19 percent of United's schedule. On the same day, 91 percent of United's flights were delayed, and, over the three-day weekend, 69 percent of United's flights were delayed.

21. The human toll was immediate and severe. Hundreds of thousands of passengers were stranded at airports across the country, separated from their luggage, unable to rebook through United's systems and left without the meals, hotel accommodations, and ground transportation that United would ordinarily provide through its established Customer Commitment.

**II. The Federal Regulatory Framework Governing Airline Customer Compensation**

**A. Department of Transportation's Regulations**

22. The federal regulatory framework governing airline customer compensation is central to this dispute because it establishes that United's payment of the Customer Costs was not voluntary or discretionary—it was legally required.

23. The DOT promulgated the "Enhanced Protections for Airline Passengers," codified at 14 C.F.R. Part 259, the express purpose of which is "to mitigate hardships for airline passengers during lengthy tarmac delays and otherwise to bolster air carriers' accountability to consumers." 14 C.F.R. § 259.1.

24. This regulatory framework applies broadly to "all the flights of a certificated or commuter air carrier if the carrier operates scheduled passenger service or public charter service". 14 C.F.R. § 259.2. This mandate is unquestionably encompassed in United's operations.

25. At the heart of this regulatory scheme is the Customer Service Plan requirement. Under 14 C.F.R. § 259.5(a), "[e]ach covered carrier must adopt a Customer Service Plan applicable to its scheduled flights…and adhere to the plan's terms." This is a binding legal obligation. The DOT has made clear that failure to adhere to a Customer Service Plan constitutes both a violation of 14 C.F.R. Part 259 and an unfair and deceptive practice in violation of 49 U.S.C. § 41712.

26. The scope of DOT's mandate is comprehensive and leaves airlines little room for deviation. Under 14 C.F.R. § 259.5(b), each Customer Service Plan must address, among other things: notifying consumers of known delays, cancellations, and diversions; providing prompt refunds in the original form of payment when refunds are due; disclosing that consumers are entitled to a refund when offering alternative transportation, travel credits, vouchers, or other compensation in lieu of refunds; notifying consumers in a timely manner of changes in their travel itineraries; ensuring responsiveness to consumer problems; and identifying the services the carrier provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections. 14 C.F.R. § 259.5(b)(2), (5), (6), (11)-(14).

27. These requirements are enforceable federal mandates, and DOT has demonstrated its willingness to hold carriers accountable for noncompliance. In *United Airlines, Inc.*, Consent

Order 2016-8-31 (Aug. 26, 2016), DOT determined that United's alleged failure to adhere to its Customer Commitment constituted a violation of 14 C.F.R. Part 259 and, consequently, an unfair and deceptive practice under 49 U.S.C. § 41712.

**B. United's Customer Commitment**

28. To fulfill its obligation to implement and adhere to a Customer Service Plan as required by 14 C.F.R. Part 259, United established its Customer Commitment. United's Customer Commitment is a publicly available, federally enforceable set of commitments that tracks the numerous categories prescribed by 14 C.F.R. § 259.5(b). With respect to significantly disrupted flights, the Customer Commitment requires United to offer prompt refunds or flight credits, digital or printed meal vouchers, hotel vouchers or cost reimbursement for overnight stays, and vouchers for hotel shuttle costs.

29. United's commitments are also published on DOT's public "Airline Customer Service Dashboards" website. For controllable cancellations and delays, these commitments include rebooking, meal or meal cash/voucher when cancellation results in passengers waiting for 3 hours or more for a new flight, complimentary hotel accommodation for any passenger affected by an overnight cancellation, and complimentary ground transportation to and from hotel for any passenger affected by an overnight cancellation.

30. DOT's heightened enforcement posture at the time of the CrowdStrike Outage was driven by Executive Order 14036, Promoting Competition in the American Economy, issued on July 9, 2021, which directed the Secretary of Transportation to better protect consumers, promote consumer safeguards, and ensure that consumers were not exposed to unfair or deceptive practices. The Executive Order directed DOT to consider amending its regulatory definitions of "unfair" and

8

"deceptive" practices under 49 U.S.C. § 41712, signaling the federal government's intent to broaden, not narrow, the scope of airline accountability to passengers.

31. By July 2024, the regulatory landscape was one in which any airline that failed to honor its Customer Service Plan commitments during a major service disruption faced enforcement scrutiny, substantial civil penalties, and the reputational damage of a public consent order finding unfair and deceptive practices.

32. On the day of the CrowdStrike Outage, the Office of Aviation Consumer Protection, emailed United "to make sure that airlines are taking steps to care for their customers" in light of the CrowdStrike Outage affecting "flights all over the world" (the "DOT Email"). The DOT Email instructed United that DOT had determined that "delays and cancellations resulting from this outage are controllable" and reminded United that "the ten largest U.S. airlines guarantee meals and free rebooking on the same airline and nine guarantee hotel accommodations when they cause flight delays or cancellations as part of the Department's Airline Customer Service Dashboard." The DOT Email further instructed United that it should "take any and all measures to ensure that you take care of your passengers and honor your customer service plan commitments when your systems are fully functional (e.g., inform passengers of covered expenses and provide ways for them to seek reimbursement at a later time)." A true and correct copy of the DOT Email is attached as **Exhibit 2**.

33. The DOT Email let United know it would face civil fines and penalties if it violated 49 U.S.C. § 41712 and 14 C.F.R. Part 259 by failing to compensate passengers in response to the CrowdStrike Outage. With potential civil penalties set at $75,000 per violation under 49 U.S.C. § 46301, even a conservative penalty assessment could yield catastrophic numbers. For example,

$75,000 multiplied by 1,600 cancelled flights would amount to a civil penalty of $120,000,000; $75,000 multiplied by just 100,000 passengers would equal a civil penalty of $7,500,000,000.

34. United knew DOT's threat was real. In December 2023, DOT and Southwest Airlines Co. ("Southwest") entered a Consent Order arising from the "Southwest Holiday Meltdown" during which Southwest's operational failures stranded over two million passengers over the 2022 December holidays. Despite Southwest paying over $600,000,000 in refunds and reimbursements to its customers, DOT found that Southwest had violated 49 U.S.C. § 41712 and 14 C.F.R. Part 259, including failing to provide prompt refunds, flight status notifications, and adequate customer service. DOT assessed $140,000,000 in civil penalties against Southwest.

35. This was the environment in which the CrowdStrike Outage paralyzed United's operations. United faced a binary choice: comply with federal law by providing the compensation its Customer Service Plan required, or face regulatory enforcement, civil penalties, and reputational harm. United chose compliance, as any reasonable carrier would and as federal law demanded.

### C. United's Loss from the CrowdStrike Outage

36. United incurred $113,670,277 in covered Loss as a result of the CrowdStrike Outage. United's Loss comprises four categories: $51,997,512 in Business Interruption; $23,529,374 in Additional Margin Losses; $20,423,430 in Passenger Compensation; and $17,719,961 in Other Extra Expense and Expenses to Reduce Loss. The only Loss at issue is the $20,423,430 in Passenger Compensation.

37. The $20,423,430 in Passenger Compensation that United paid (the "Customer Costs") was not only reasonable but legally compelled. Customer Costs fall into three categories, each of which reflects United's good-faith compliance with the DOT's federally mandated

Customer Commitment under circumstances that were extraordinary, unprecedented, and entirely beyond United's control.

38.     The first category consists of nearly $5,400,000 in vouchers issued for customers' meals, hotels, and ground transportation. These costs fall squarely within the express language of United's Customer Commitment and the DOT regulatory framework that mandates compliance with that Customer Commitment. United's Customer Commitment requires United to provide meal vouchers, hotel accommodations, and ground transportation to passengers affected by controllable cancellations and delays, and that is precisely what United did.

39.     The second category consists of approximately $6,300,000 in cash reimbursements for customers' out-of-pocket expenses for meals, hotels, and ground transportation. These reimbursements were made where vouchers would have been issued in the ordinary course but were infeasible under the exigent circumstances of the CrowdStrike Outage. The demand for customer assistance was immediate and overwhelming, and the Outage itself affected the systems that would otherwise facilitate customer assistance, exceeding United's capacity to process and issue vouchers through its normal channels. Passengers needed meals, hotel rooms, and ground transportation immediately. DOT specifically warned United to "take care" of its customers under these circumstances, making clear that the agency expected United to fulfill its Customer Commitment obligations regardless of whether its standard voucher-issuance systems were operational, and even suggested one way of doing so ("e.g., inform passengers of covered expenses and provide ways for them to seek reimbursement at a later time."). Under these extraordinary circumstances, cash reimbursements were not only a reasonable means of fulfilling United's legally mandated obligations, but one way the DOT specifically expected United to .

11

40. The third category consists of approximately $8,600,000 in Electronic Travel Credits ("ETCs") issued to passengers as compensation for meals, hotels, and ground transportation. The basis for recovering these costs is the same as for cash reimbursements: providing ETCs to passengers as compensation where issuing vouchers was not feasible constitutes another means for reimbursing passengers as mandated by the DOT.

**III.    United's Cyber Insurance Program**

41. To protect against the very type of catastrophic cyber event such as the CrowdStrike Outage, United maintained a comprehensive, multi-layered cyber insurance program providing up to $200,000,000 in coverage above a $50,000,000 SIR.

42. The structure of this tower — and the fact that every Underlying Insurer and Indian Harbor (in the same layer as Homesite) has honored its coverage obligations — is critical context for the dispute. United's cyber insurance tower through the fourth layer is structured as follows:

| SIR | | | $50,000,000 |
|---|---|---|---|
| Primary[2] | AIG | 01-123-36-04 | $15,000,000 xs[3] $50,000,000 |
| First Excess | Starr | 1000199313241 | $5,000,000 xs $65,000,000 |
| First Excess | Evanston | MKLV7PL0006456 | $5,000,000 xs $65,000,000 |
| Second Excess | Scottsdale | XMS2409217 | $10,000,000 xs $75,000,000 |
| Third Excess | Starr | SLSLPRX26640024 | $5,000,0000 xs $85,000,000 |
| Third Excess | Liberty | EO4NAAF47L013 | $5,000,0000 xs $85,000,000 |
| Fourth Excess | Indian Harbor | MTE904515802 | $5,000,0000 xs $95,000,000 |
| Fourth Excess | Homesite | YXS-158749112-01 | $5,000,0000 xs $95,000,000 |

---

[2] Green shading indicates that the insurer paid its full limits toward United's CrowdStrike Loss.  Red shading indicates the insurer refused to pay anything towards United's CrowdStrike Loss.
[3] "xs" means "Excess Of".

43.     Every other insurer in this tower, from AIG to Indian Harbor, has paid its full policy limits to United in connection with the CrowdStrike Outage. Every insurer reviewed the same facts, evaluated the same Loss, applied the same policy language, and concluded—without exception—that United's claims fall within the coverage provided. Homesite alone refuses to pay. That Homesite's position is not shared by a single other insurer in the tower—including the insurer that sits in the very same layer—is a powerful indictment of Homesite's coverage denials.

## A. The Homesite Excess Policy

44.     Homesite issued an Excess Follow Form Cyber Liability Insurance Policy to United effective June 1, 2024 to June 1, 2025, Policy No. YXS-158749112-01. As noted above, the Homesite Policy provides a $5,000,000 aggregate and single loss limit of liability in excess of $95,000,000.

45.     The Homesite Policy's Insuring Agreement provides that:

> This Policy provides coverage for any **Loss** resulting from **Claims** against the **Insureds**, or from **Incidents**, for which coverage is provided under the **Followed Policy**, and shall attach only after the insurers of the **Underlying Insurance**, the **Insureds**, or any other source, shall have paid in legal tender the full amount of the **Underlying Insurance**, and any applicable retention.

> Except to the extent specifically addressed herein or in any endorsement to this Policy, the coverage provided is subject to all terms, conditions, representations, limitations, exclusions and restrictions of the **Followed Policy** which are in effect as of the Effective Date of this Policy. If there is any conflict between the terms and conditions of this Policy and the **Followed Policy**, this Policy shall supersede. In no event shall this Policy provide coverage broader than that provided by the **Followed Policy** or any more restrictive terms included in any **Underlying Insurance**.

(**Ex. 1**, Insuring Agreement.)

46.     The "Followed Policy" is the primary policy issued by AIG, Policy No. 01-123-36-04, ("AIG Policy). (**Ex. 1**, Declarations.) A true and correct copy of the AIG Policy is attached as

**Exhibit 3**. The Homesite Policy thus adopts all of the terms and conditions of the AIG Policy

discussed in the next section.[4]

47.     The Homesite Policy also includes the following provision regarding exhaustion

and erosion:

> In the event of the reduction or exhaustion of the Aggregate Limit(s) of Liability of the **Underlying Insurance** by the payment of **Loss**, this policy shall:
>
> 1.  In the event of reduction, the Limits of Liability of this Policy shall apply excess of the reduced Limits of Liability of the **Underlying Insurance**; and
>
> 2.  In the event of exhaustion, this Policy shall continue in force as primary insurance for any covered **Claim** or **Incident**, but the Limits of Liability of this Policy shall apply excess of the **Followed Policy's** retention or deductible, as applicable.
>
> (**Ex. 1**, Conditions.)

**B.  The AIG Primary Policy**

48.     The AIG Policy includes a Network Interruption Coverage Section that affords the

following coverage:

> The Insurer shall pay all Loss in excess of the applicable Retention that an Insured incurs solely as a result of a Material Interruption, provided that the length of the Material Interruption exceeds the Waiting Hours Period.
>
> (**Ex. 3**, AIG Policy, NIC Section, Insuring Agreement.)

49.     "Material Interruption" means any of the following:

> (1)     The suspension or degradation of the service provided by the Computer System caused by a Security Failure, System Failure, Voluntary Shutdown or Regulatory Shutdown;
>
> (2)      The suspension or degradation of the services provided by an Outsource Provider used by the Company solely caused by an OSP Failure; or
>
> (3)     The inability of the Company to access Electronic Data due to such Electronic Data being deleted, damaged corrupted, altered or lost, but only when caused by a Security Failure, System Failure or OSP Failure.

---

[4] All of the Underlying Policies likewise follow form and adopt the terms and conditions of the AIG Policy.

(**Ex. 3**, Definitions.)

50.     "System Failure means any unintentional and unplanned outage of a Computer System[5] that is not part of or caused by a Security Failure."[6]

51.     The AIG Policy defines "Loss" as "the actual Business Income Loss, Expenses to Reduce Loss and Extra Expenses sustained or incurred by an Insured." Endorsement 2, the Civil Aviation Endorsement, amends this definition as follows: "Loss also means any Civil Aviation Fines or Passenger Compensation that the Insured is legally liable to pay in respect of a Flight Cancellation or Delay."

52.     The Endorsement defines "Civil Aviation Fines," "Civil Aviation Law, " "Passenger Compensation," and "Passenger Compensation Law" as:

> **"Civil Aviation Fines"** mean any lawfully insurable fines or penalties which are levied against, imposed upon or otherwise adjudged by a public, governmental or regulatory body to be payable by an Insured for breach of any Civil Aviation Law; provided, however, Civil Aviation Fines shall not include any industry-wide, non-firm specific inquiries or actions.

> **"Civil Aviation Law"** means any law or regulation in any country which may impose financial penalties on an airline for flight delays, denied boarding or flight cancellations, including, without limitation, 14 CFR Part 259 (US) and any amendment or replacement.

> **"Passenger Compensation"** means any financial compensation paid, or the cost of any assistance, food, drink, accommodation or service provided to passengers by an Insured in order to comply with any Passenger Compensation Law.

> **"Passenger Compensation Law"** means any law or regulation requiring an airline to compensate and assist passengers in the event of any flight delay, denied boarding or flight cancellation, including without limitation, EC Regulation 261/2004 (EU), DGCA Civil

---

[5] "Computer System" means any computer hardware, software or any components thereof that are linked together through a network of two or more devices accessible through the Internet, internal network or connected with data storage or other peripheral devices (including, without limitation, wireless and mobile devises), and are under the ownership, operation or control of, or leased by, a Company.

[6] "Security Failure" means a failure or violation of the security of a Computer System, including, without limitation, that which results in or fails to mitigate any unauthorized access, unauthorized use, denial of service attack or receipt or transmission of a malicious code. "Security Failure" includes any such failure or violation resulting from: (i) the theft of a password or access code by electronic or non-electronic means; (ii) the use of a third-party computer or electronic device, including mobile phones, tablets or computers owned or controlled by a partner, shareholder, officer or employee of a Company, to access a Computer System; or (iii) Cyberterrorism.

Aviation Requirements Section 3, Series M Part IV (India, The Civil Aviation Act 1990 (New Zealand), and any amendments or replacements thereof.

(**Ex. 3**, Endorsement 2.)

53. The AIG Policy also includes the following Retention provision:

The **Insurer** shall only be liable for the amount of **Loss** arising from each **Claim** or **First Party Event** that exceeds the Retention stated in Item 6 of the Declarations [$50,000,000] as applicable to the **Coverage Section** affording coverage to such **Claim** or **First Party Event.** Such Retention amounts must be borne by the **Insureds** and remain uninsured; *provided, however, where an **Insured** is an additional insured under a policy issued to a third party that is not an Insured under this policy, and where this policy is excess over and does not contribute with such policy with respect to any Loss covered under this policy, the Insurer will recognize erosion of the Retention by any payments made on behalf of an Insured under such policy for covered Loss under this policy.*

(**Ex. 3,** emphasis added, GT&C, Retention.)

## IV. United Seeks Coverage from Homesite

54. On December 3, 2024, United submitted its initial claim to Homesite for coverage under the Policy for Loss arising from the CrowdStrike Outage. United amended its claim on December 17, 2024.

55. On April 29, 2025, United wrote to Homesite and the other insurers in United's cyber insurance tower to explain the effect on the SIR of United's recovery as an Additional Insured under third-parties' insurance policies. Pursuant to the express language of Section 5 of the AIG Policy's General Terms and Conditions, payments made on behalf of United as an additional insured erode the $50,000,000 SIR, and that "[a]ny other interpretation would be directly contrary to the plain language of this Section."

56. On June 18, 2025, United submitted an updated Proof of Loss in the amount of $113,670,277.

57. On July 7, 2025, Homesite's responded with a letter that, for the first time, set forth Homesite's detailed coverage positions—positions that no other insurer in the tower relied on to

16

deny coverage and that defy the plain language of the Policy. Homesite took the extraordinary position that United's $20,423,430 in Customer Costs were not covered Passenger Compensation because, in Homesite's view, United's Customer Service Plan only obligates United to provide "vouchers and assistance finding lodging accommodations," and that cash reimbursements and ETCs were therefore "voluntary." In other words, Homesite's position was that when the CrowdStrike Outage itself knocked out United's systems for issuing vouchers, United should have simply done nothing—and let hundreds of thousands of passengers fend for themselves—or else forfeit insurance coverage.

58. On July 25, 2025, United asked Homesite to reconsider its preliminary positions. United explained that the CrowdStrike Outage "caused a massive outage of United's IT system, paralyzing significant parts of the airline and stranding more than 200,000 of its customers," and that "[h]ad United not made those payments, it would have been subject to civil penalty enforcement action by the U.S. Department of Transportation." United further demonstrated that Homesite's reliance on the "third-party liability" exclusion was not a good-faith position because Endorsement 2 amended the AIG Policy to specifically cover "Passenger Compensation that the Insured is legally liable to pay in respect of a Flight Cancellation or Delay." Homesite's position that Endorsement 2 had no effect on the AIG Policy's third-party liability exclusion amounted to saying "that United paid a premium for nothing" – a position that "[n]o court would enforce."

59. On August 25, 2025, rather than reconsidering its untenable positions in light of United's detailed response and the fact that every other insurer in the tower had already paid, Homesite doubled down on every one of its coverage denials. Homesite maintained that 14 C.F.R. Part 259 "is neither referenced in the policy language as one of the statutes that qualifies as a Passenger Compensation Law nor does it include mandatory obligations to compensate passengers

for delayed/cancelled flights." This position is flatly contradicted by the Policy itself: the definition of "Civil Aviation Law" in the same endorsement expressly references "14 CFR Part 259 (US)," and the definition of "Passenger Compensation Law" uses the phrase "including, without limitation"—a phrase that under Illinois law is a term of enlargement, not restriction. Homesite further characterized United's legally compelled payments as mere "operational choices" and asserted that DOT's directive "does not transform United's operational choices into a mandatory Passenger Compensation Law within the meaning of Endorsement #2."

60.     Homesite's August 25, 2025 letter also took the remarkable position that United's $20,423,430 in Customer Costs—the very costs that DOT ordered United to pay, that were legally compelled under federal law, and that every other insurer in the tower agreed were covered—were merely "discretionary payments made to appease customer dissatisfaction" and "gestures of goodwill." To characterize federally mandated compliance as "goodwill" is to deny reality. Homesite further asserted that United had "violated the requirement in the policies that the Insured not assume any financial obligation or incur any cost without the prior written consent of the insurers"—a position that, taken to its logical conclusion, would have required United to telephone Homesite's claims department and obtain written permission before complying with a binding DOT directive during an unprecedented operational crisis affecting hundreds of thousands of stranded passengers in the moment. The absurdity of this position speaks for itself.

61.     With respect to the SIR, Homesite took the position that insurance payments made on behalf of United as an Additional Insured did not erode the SIR—despite express policy language providing exactly that. Homesite asserted that "the documentation provided does not satisfy United's burden to establish that the carveback" applies and argued that any recovery by

18

United should be offset against United's total Loss rather than the SIR. This position ignores the plain language of Section 5 of the AIG Policy, quoted above, which the Policy expressly follows.

62.     On September 22, 2025, United responded stating that Homesite's "letter's arguments are the sort of non-substantive hair-splitting divorced from reality that no judge or jury would ever accept." United's counsel specifically noted that "for Bowhead to take the position that its policy does not cover cash payments substituted for specified compensation when the specified compensation cannot be made under the circumstances—and call the cash payments voluntary— is to elevate form over substance in the worst possible manner."

63.     United further noted that Indian Harbor Insurance Company, which shares Homesite's layer of liability on a 50/50 basis, paid its 50% share of each dollar owed up to its full $5,000,000 limit. United stated that "it is clear that the bad faith positions taken by Bowhead are at its direction, and given the positions, likely motivated by considerations other than seeking to find coverage in good faith as every insurer is required to do."

64.     United proposed non-binding mediation as required by the Policy and stated that "United is very unhappy with [Homesite's] non-commercial position in this matter, and in the event mediation is not successful, United intends to pursue all remedies available under the policy and at law, including seeking 5% statutory interest on any award made in litigation and pursuing a bad faith claim."

65.     The parties thereafter participated in non-binding mediation on April 21, 2026, but were unable to resolve the dispute.

## COUNT I
### (Breach of Contract)

66.     United repeats and incorporates the allegations set forth in paragraphs 1 through 65 above as if fully set forth herein.

67.     The Policy provides coverage for the Loss submitted by United in its Proof of Loss, including Business Interruption, Additional Margin Losses, Passenger Compensation, and Other Extra Expense and Expenses to Reduce Loss arising from the CrowdStrike Outage.

68.     All conditions precedent to recovery under the Policy have been satisfied, waived, or are otherwise inapplicable. United timely submitted its claim and Proof of Loss, participated in non-binding mediation as required by the Policy, and the SIR and underlying limits have been fully exhausted.

69.     Homesite has breached the Policy by failing to pay United's covered Loss, including its full $5,000,000 policy limits.

70.     As a direct result of Homesite's breach of the Policy, United has been deprived of the benefit of insurance coverage for which it paid substantial premiums and has been forced to bear $5,000,000 in covered Loss that Homesite has refused to pay.

### COUNT II
**(Bad Faith)**

71.     United repeats and incorporates the allegations set forth in paragraphs 1 through 70 above as if fully set forth herein.

72.     Homesite has acted in bad faith because of its vexatious and unreasonable delays and ultimate failure to pay United's clearly covered Loss.

73.     Despite accepting substantial premiums to provide cyber insurance coverage for United, Homesite did not honor its contract in good faith after the CrowdStrike Outage struck. Rather than conduct a fair and objective evaluation of United's claim—as every other insurer in the tower did—Homesite adopted a strategy of denial and obstruction, raising one baseless objection after another, each contradicted by the plain language of the Policy it issued and not relied on by any other insurer that examined the same claim. Homesite forced United to expend

significant time, resources, and legal fees responding to positions that no other insurer in the tower shared, that no reasonable insurer would take, and that appear designed not to reach a good-faith coverage determination but to avoid paying a valid claim.

74. Homesite's bad faith behavior includes, but is not limited to, the following specific conduct:

(a) Homesite acted in bad faith when it took the position that 14 C.F.R. Part 259 is not a "Passenger Compensation Law" under the Policy, despite the fact that the Civil Aviation Endorsement's definition of "Passenger Compensation Law" uses the phrase "including, without limitation"—a phrase that under Illinois law is a term of enlargement, not restriction—and despite the fact that 14 C.F.R. Part 259 is expressly referenced in the definition of "Civil Aviation Law" within the same endorsement.

(b) Homesite acted in bad faith when it characterized United's $20,423,430 in Customer Costs—payments that DOT ordered United to make and that were legally compelled under federal law— as "voluntary," "discretionary," and mere "gestures of goodwill." This characterization is divorced from reality. United faced binding federal obligations under 14 C.F.R. Part 259, a direct DOT directive to compensate its passengers, and the threat of civil penalties of $75,000 per violation—penalties that, applied across 1,600 cancelled flights and hundreds of thousands of stranded passengers, represented potential liability in the hundreds of millions, if not billions, of dollars. No reasonable insurer could conclude that compliance with federal law is "voluntary." Every other insurer in the tower agreed these costs were covered Passenger Compensation.

(c) Homesite acted in bad faith when it asserted that the "third-party liability" exclusion bars coverage for the Customer Costs, despite the fact that the Civil Aviation Endorsement specifically amends the definition of Loss to include Passenger Compensation—which by its very nature involves payments to third-party passengers. Homesite's interpretation renders the Civil Aviation Endorsement, for which United paid additional premium, a complete nullity. No reasonable insurer would take the position that a policyholder paid for coverage that was simultaneously excluded by the very same policy.

(d) Homesite acted in bad faith when it asserted that United had "violated the requirement in the policies that the Insured not assume any financial obligation or incur any cost without the prior written consent of the insurers." This position is not merely unreasonable—it is preposterous. It would have required United, in the midst of an unprecedented operational crisis affecting hundreds of thousands of stranded passengers, to halt compliance with binding DOT directives and seek Homesite's written permission before providing federally mandated meals, hotel rooms, and ground transportation to stranded passengers. No insurer acting in good faith would demand that its policyholder choose between federal regulatory compliance and insurance coverage.

(e) Homesite acted in bad faith when it took the position that insurance payments made on behalf of United as an Additional Insured do not erode the SIR, despite express and unambiguous policy language providing exactly that. Homesite's position contradicts the plain language of Section 5 of the AIG Policy, which Homesite's own Policy expressly follows.

(f) Homesite's bad faith is further evidenced by the fact that Indian Harbor Insurance Company—which shares Homesite's exact layer of liability and is subject to the same policy terms—reviewed the very same claim, applied the very same policy language, and paid its full $5,000,000 limit without raising a single one of the objections Homesite has asserted. The diametrically opposed positions taken by two insurers in the same layer of the same insurance program, reviewing the same claim under the same policy terms, confirm that Homesite's coverage denials are not the product of a good-faith evaluation of coverage but are instead driven by a desire to avoid its contractual obligations.

(g) Homesite unreasonably and vexatiously delayed the adjustment of United's claim, taking months to respond with its first substantive coverage position, and thereafter failing to provide reasonable explanations for its coverage positions when it finally did respond. Homesite's delays compounded the harm to United by prolonging the period during which United was deprived of the insurance proceeds to which it was entitled.

75.     Through its conduct described in this Complaint and otherwise, Homesite has violated at least the following provisions of Section 154.6 of the Illinois Insurance Code that identify unfair insurer claim handling practices:

(a) Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;

(b) Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies;

(c) Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;

(d) Refusing to pay claims without conducting a reasonable investigation based on all available information; and

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.

76.     Homesite's conduct in handling United's claim—raising baseless objection after baseless objection, ignoring the plain language of the Policy it issued, disregarding the unanimous consensus of every other insurer in the tower, and forcing United to litigate for coverage that is

22

plainly owed demonstrates an attitude focused on finding ways to deny coverage rather than objectively looking for coverage – and constitutes vexatious and unreasonable delay and denial.

77.     As a result of Homesite's bad faith behavior, United has been forced to incur substantial damages that were reasonably foreseeable by Homesite, including the full $5,000,000 in unpaid policy limits, substantial attorneys' fees and costs in responding to Homesite's baseless "reasons" for denial, the cost of a required but pointless mediation, and the cost of prosecuting this action, among others.

## **PRAYER FOR RELIEF**

WHEREFORE, United respectfully requests that this Court enter judgment in its favor and against Homesite as follows:

(a) With respect to Count I, enter a judgment against Homesite awarding:

> (i) all money damages that United has suffered as a result of Homesite's breach of the Policy, including the full $5,000,000 in policy limits; and

> (ii) pre- and post-judgment interest.

(b) With respect to Count II, enter a judgment against Homesite finding that it has acted in bad faith in handling United's claim, and pursuant to 215 ILCS § 5/155 award United its attorneys' fees, other costs, and all other amounts allowed pursuant to Section 155.

(c) Award United such other and further relief as this Court deems just and proper.

**United demands a jury trial for all issues triable by jury.**

DATED: July 21, 2026

Respectfully submitted,

/s/ *John S. Vishneski III*
John S. Vishneski III
Jessica E. Brown
Jalen M. Brown
REED SMITH LLP
10 South Wacker Drive
Chicago, IL  60606-7507
Telephone: +1 312 207 1000
Facsimile: +1 312 207 6400
jvishneski@reedsmith.com
jebrown@reedsmith.com
jalenbrown@reedsmith.com

*Attorneys for United Airlines Holdings, Inc.*